Mr. Bondaroff, you want to take the lead here, sir, and do you have any time you want to save for rebuttal? Thank you, Your Honor. This is Sam Bondaroff on behalf of the plaintiffs and tutored class in this case. May it please the court, I'd like to reserve three minutes for my rebuttal. Okay, that's a done. This case primarily turns on the application of the case of Fifth Third Bank Corp, the Dudenhofer, the Supreme Court case in 2014. And so I think it's important to just establish at the outset what the primary holding of that case is and then talk about how it can be applied to this case. Dudenhofer fundamentally stood for the proposition that the duty of prudence owed by a fiduciary owned under ERISA with respect to any other investment. The only difference is... Hold on just a second, Mr. Bondaroff. You can rest assured we've all read the case, but it'll help if we hone in on the distinction that the Second Circuit in the now vacated decision in Chander pointed to where the Supreme Court in Fifth Third seemed to go back and forth on whether what we're dealing with here is a circumstance in which you have to ask the question, is what you're suggesting on behalf the point of something that a prudent fiduciary would have considered as causing harm than good, or whether it is one that a prudent fiduciary could have. And I take that distinction to mean maybe it's a distinction without a difference and the Second Circuit was, you know, making up an issue out of whole cloth. But it seems to me that that's an issue that would be helpful for me to get a handle on. Your argument, as I get it, is there was an antitrust violation. That inflated the stock. So that conspiracy caused an inflation stock, and they should have done something to correct that, that the ESOC fiduciary is here. Are we operating under a standard where we're asking whether all the alternatives you suggested are ones that would have prompted a prudent fiduciary to say, hmm, that could do more harm, or one where it could have prompted any fiduciary, any prudent fiduciary to think that? Well, thank you. I mean, I think that's an important issue to focus on. To some extent, I think it actually may be less of a distinction than some of the courts and parties have made it out to be. It could have, would have distinction. Because ultimately, you're still asking what a hypothetical prudent fiduciary would have done. You know, you don't want the standard to be so broad for a reason, you know, you don't want to make it so easy for a fiduciary to say, no, we don't need to take action because there is some outside possibility of something bad happening. Because then you're really not talking about a hypothetical prudent fiduciary anymore. You're just talking about any hypothetical fiduciary. And the point of doing that... Are we, are we, so wait a second, are you saying that it's really a distinction without a difference? That the Second Circuit in drawing that comparison was making a distinction that shouldn't, it just, it really doesn't matter. What do you say, would or could, the issue's the same? I think for the most part, that's correct. And, you know, the Second Circuit, I think, was trying to deal with, you know, a circumstance that's unique to that case that is not an issue here, which is that in Jander, you had a, you know, you all, like here, had a parallel securities class action with the same underlying alleged misconduct leading to artificial inflation under the securities laws. But in that case, the securities claim was dismissed at the 12B6 stage. Whereas in this case, the same set of underlying allegations was plausible under the securities laws. Another court in the District of New Jersey found that the same set of claims gave rise to disclosure obligations under the securities laws. Yeah, what's the status? They survived the motion to dismiss, and I believe they're in discovery. Are you talking about the PSLRA case before Judge Hayden? Yeah, there's two, as I understand it, in the briefing, which your briefing goes back to, your reply brief goes back to January of 2019, and a quick bring down, but I don't know if it's accurate or not, looks like the District of New Jersey case is in the midst of briefing on class certification, and that the MDL in the Eastern District of Pennsylvania is still going on. Am I right about that? I believe that is correct, yes. Okay, we'll ask Mr. Haraka when the time is right on that. It's Judge Bevis, so there are opinions in both cases from August 2019 on motion to dismiss, so both of them are past that point. Yeah. Okay. Well, I'm not sure. It's hard for me. This is one of the difficulties of not being all together. I'm not picking up signals from my colleagues about when they want to jump in. I'm sure they do, but we're going to end up giving you more than your 15 minutes, Mr. Bonner. I've got plenty of questions here. It's Judge Bevis. Maybe this is a good time to segue to that one, which is I'm a little surprised that appellants haven't filed. Your complaint is what, 2017, right? And your reply brief, as Judge Jordan notes, was filed quite some time ago. You haven't filed anything supplemental to draw to our attention. Are there developments in those other cases that you would bring to our attention, would have brought to our attention, that we ought to consider, you know, particularly if we find that your current complaint isn't specific enough on the 12-minute ball? Are there additional things you would add from those cases or anything else to give more color and texture to your allegations? Well, focusing on the Bufordian case, which is the PSLR case under Judge Hayden, because that really is based on almost, you know, identical underlying allegations of misconduct, you know, regarding the antitrust conspiracy. And I think what we would have done and perhaps should have done, and I regret not doing this, is provided the court with a Rule 28J letter regarding the outcome of that case on the motion to dismiss in August of 2019. The reason we didn't do so is that at the time this case was stayed, pending the outcome of gander in the Supreme Court, and by the time we came back, too much time had passed. But I think that that case and that outcome is particularly relevant here because you have a defendant in both cases, the former CFO, Katz Bevelato, who was both an arrested fiduciary, that's undisputed, and also a corporate officer with disclosure obligations. And you have a court finding that the same set of facts regarding that defendant are enough to say that there is de-enter and material misrepresentation and loss causation, everything that the SLA requires, so that she should have tried to make a disclosure during the class period about the antitrust conspiracy. But at the same time, you have a holding saying that those exact same facts are not sufficient to give rise to a disclosure obligation under ERISA, which means that essentially if she had made a disclosure, as the securities case alleged she should have, it would have satisfied her duty under the security clause, but somehow wouldn't be required or satisfy her duty under ERISA, which essentially means that the duty she owed to the shareholder on the street  that's supposed to be the highest duty known to the law. Hold on just a second, Mr. Bonneroff, because this is getting into something that I'm interested in from the Supreme Court's decision in Chandra. I mean, they kicked this thing back and said, in effect, hey, you didn't pay attention to whether the kinds of alternatives you were suggesting were consistent with the complex securities and corporate disclosure laws that people operate under, and we think you need to do that in the first instance. And I think they also were pretty clear about noting that the government, sort of a friend of the court in that decision, had taken the position that disclosing or taking the actions that Chandra was alleging should have been taken in that case would have conflicted. Are we – should we be paying attention to that same line of reasoning here, the government's position in Chandra? And if so, where does that leave you? I think the government's position in Chandra is worth paying attention to, and it would lead you to find that the motion to dismiss the dismissal here should be reversed, because unlike in the case of Chandra, you have at least one fiduciary defendant who has disclosure obligations under the securities laws and should have made the disclosure under the securities laws, which would have also satisfied her disclosure obligation under ERISA. So if you adopt the government's position as to what is the correct application of student law and the standards, you would find that we plug the alleged claim here, because in Chandra, again, you have the securities case having been dismissed. I would take somewhat issue with how the Supreme Court viewed these arguments in sending it back to the Second Circuit. I actually argued Chandra in the Supreme Court, and the arguments raised by the petitioners and the government in that case, the court was open to them, but they had not been raised in the question presented in that cert petition. They only were raised during the regular briefing. So I think more than anything else, the court felt that they just weren't right yet, and that they had not been raised before the Second Circuit. So Ms. Chandra, it's very helpful that you were countful in that case, because I, too, and Judge Bevis have some questions about the SG's brief in that case. So this goes to your first three remedies. So as to the first one, the SG drew a distinction saying, yes, it ought to be actionable if you allege that the fiduciary did not make a disclosure that was required by the securities laws, which sounds like it's your argument here, but the SG was extremely reluctant, didn't say never, but said it would be a rare or exceptional case in which ERISA ought to impose duties beyond those imposed by the security laws. I'm not sure if that's right or not, but that was the government's position there. So your response here, as I understand it, is that you could satisfy even the SG's standard because the PSLRA case is still pending and there are alleged things that weren't disclosed. Now, the problem is those aren't stated in your complaint right now, but maybe you could amend it to add in more specifically what should have been disclosed. So let's talk about that one for a minute. What would you add in as more – I'm sorry. I guess you're saying that the disclosures that were made later should have been made earlier. Are those the disclosures you would point to? Yes, and before I continue, I want to know, according to my clock, I'm down to three minutes. Yeah, you're on our time. Mr. Bonarosa and Mr. Harak, this might be the problem of this being a one-off case, but we've got the luxury of time and we're taking it. I mean, this is an important case, so please go ahead and answer. So you're not cutting into Rebecca's time by doing this, then? That's fine. Okay, thank you very much. To return to the question, the allegations in the Forden case that were found to be sufficient, the facts alleging the antitrust conspiracy were largely the same as the ones alleged in our complaint. There have been some developments since then. The criminal complaint that we were concerned was going to be filed in our complaint was filed subsequent to our complaint by the Department of Justice, and the state attorney general filed their civil complaint with Allergan as a defendant. There may even be some discovery now in some of the civil antitrust cases that have taken place that could add to the allegations we make. It's Allergan that's a defendant in the federal and state criminal complaints. I believe they are a defendant in the civil state actions. I'm not seeing the criminal ones, but we can give you, if this is an issue, we can take a supplemental letter on that. You're correct in that sense. Yeah, correct that there's no – well, we're trying to do some bring down on the stuff ourselves in terms of research, but I'm not seeing where they're a defendant in any criminal case. Am I wrong about that? No, you are correct. They are a defendant in the civil case filed by the state attorney general. They are not a defendant in the criminal case. Great. One of the issues, then, that I expect Mr. Haraka is going to be talking about, you can go ahead and take it up right now, is you keep talking about they should have disclosed, they had an obligation to disclose, it's going to inevitably come out, this problem they should have disclosed, and the question is disclose what? Your assertion is, as the district court said, all speculation the defense tells us. There's nothing except public statements by interested politicians and parties that cast some shade on Allergan, but that's it, nothing else. You've got no information to indicate they participated in any antitrust conspiracy at all, except for a couple of press releases that you've pointed to, and that's public information, so contrary to your assertion in your applied brief that public information stuff has nothing to do with this, you've got nothing but public information. Why don't you go ahead and take that argument on. Well, that issue is no different than what you're dealing with in the securities case. In antitrust cases it's very difficult without a whistleblower or a criminal complaint to allege that there has been a price-fixing conspiracy. What you can normally only point to is the circumstantial evidence of that conspiracy, the price rise in concert and the fact that there was this subpoena issue and this other public information. Unfortunately, you have to infer the knowledge of the participation in the conspiracy from those facts because you don't have an insider. Mr. Bondaroff, I'm surprised that's your answer because when I look at the District of New Jersey PSOA case, the amended complaint details specific communications between Allergan and other drug companies, including Heritage, whose former president and CEO pled guilty to antitrust violations, about a price-fixing agreement. So I would have thought you'd be relying on those kinds of non-public facts and communications. I'm looking at Judge Hayden's opinion to non-notion of the Smiths of August 6, 2019. So why are you relying on the public statements here exclusively? Well, I think, actually, that one of the things that we would amend our complaint to add would be those allegations. If we had the opportunity to amend, which we did seek in our appeal, is the opportunity for me to amend. And those are the kinds of things that you didn't have. You didn't request to amend. You didn't give her any specifics about what you wanted to ask. True, but a lot of this information, you know, this appeal has been pending for quite some time. Okay. Okay. This information came up since then. I understand that argument. Perhaps I can take you – I'm a little concerned about some of your other proposal remedies, and I want to make sure to hear about that before you sit down, so to speak. So your second and third remedy, the second one is stopping purchases. And the third one is building a cash buffer. And I'd like to understand the differences between them because the SG, it is brief in gender to the Supreme Court, said the second one would violate the securities laws. It would amount to insider trading if you seized some kind of pattern of buying that you had announced beforehand or you continued to sell, as ESOPs had to do, but not buy. So I don't take you to be disputing that. If you have a response, I'd love to hear it. But is your third one about building the cash buffer any different? Is it likewise in violation of Rule 10b-5? Because obviously under the third, a fiduciary never has to consider it an illegal opportunity. So if this is illegal, if you can't show us it's legal or if your adversary can show us it's illegal, then that's the end of that remedy. So explain why the third one is on the table and whether it's different from the second or whether you disagree with the SG's analysis of the second one. Sure. Well, I would say one thing first of all about the Solicitor General's position on the second remedy. What they say is that you can't just stop selling because if you stop selling, then you're essentially trading on inside information. But what you can do is stop buying and selling, essentially freeze the funds. That is permissible under the security rules. There would be a required disclosure that you'd have to make. You'd have to file an APK, but you would not have to say why you're freezing. You would just have to say the stock plan had chosen to freeze purchases and sales. Won't that send a signal to the market that, hey, the game's up if they freeze their ESOP? It will. It will, which is kind of the point. Well, if that's the point, Mr. Bonneroff, then you've got to face head-on the could-have-done-more-harm standard. If the signal you're sending to the market is, hey, we've got such a big problem, even we can buy our stock, how is that not landing you straight in that third category the Supreme Court points to in Fifth Third as something a prudent fiduciary would be paying attention to? Well, this is really where I think the main concern about how good and awful is being applied comes into play because ideally we say the best thing to do is make a disclosure, especially if you have somebody who's a fiduciary who also has security disclosure obligations that satisfy both duties with one action. Now we're told that's not enough because even though they have to disclose under the security laws, under ELISA they might think that it would be worse to disclose now rather than later, even though they know that they're covering up misrepresentation. So then we say, well, okay, what about sleeping the funds so that you can't make any purchases or sales? Well, that's going to send a bad message to the market. You can't do that either because then it's too ambiguous. The market might interpret it wrongly and the stock could go down. Okay, but what about just putting the money into the cash buffer rather than buying stock? That would even require a disclosure under the SEC. You know, that's by definition. Yeah, by definition, I guess that just must be obtuse. If you say, hey, I'm not saying don't buy stock. I'm saying instead of buying stock, keep cash. So what's the difference? In either case, you wouldn't actually have to make that kind of disclosure to plan participants because plan participants only know that they're buying shares of this unitized fund, and they know that the share is primarily investing in stock, but it's not exclusively investing in stock. It also invests in cash. And so what you're doing is essentially taking the money that they're putting in and you just move it into the cash unless and until the artificial inflation ends. And you're saying that the market doesn't know that. Nobody's paying attention to that. Moreover, as the defendants point out, that by moving into cash, you are potentially doing harm because of the investment drag argument they make. Right. Well, I mean, this is where it gets a little frustrating because, yes, there would be some drag, but the point is there's only drag if the stock is priced where it should be. If the stock is artificially inflated and is going to go down when the truth is revealed, then you haven't dragged at all. You've actually protected against harm. You've actually helped them. There's only drag when the stock is trading where it should be. But the thing is, if all of these investments, if all these alternative actions, we can imagine some hypothetical fiduciary who might be worried about a stock price drop, then there is no solution that works here. There is no alternative. That's where you get to the could versus would issue, right? Because, I mean, we didn't come up with this language. You didn't come up with this language. There was a widespread understanding amongst the courts of appeals that the way to approach this was to give presumption to the fiduciaries, and the Supreme Court said, yeah, don't do that. And you may be right that the reason they did it is because they wanted to loosen this up. Maybe that's what they had in their mind. I don't know. But what we have to deal with is what they actually said. And what they said was, at one point, if a prudent investor could have thought this was going to be more harmful than helpful, then, hey, motion to dismiss. That's a real important tool for weeding this out. We've taken away the prudent presumption, and we're pointing you to the motion to dismiss, you courts. Use it. Now, what are we supposed to do with that, Mr. Bonner? On the one hand, you seem to be saying you're in a catch-22. They couldn't possibly have meant this. On the other hand, we're looking at Supreme Court language. It says what it says, and the Supreme Court pointing directly to motion to dismiss and saying that's your tool to weed this stuff out. How are we supposed to deal with that? Well, two ways, I think. The first is to look at the rest of the decision and not ignore it and not interpret that language in a way that's going to contradict the rest of the decision. Because if you interpret the could-would standard, the more harm than good standard, so broadly that it becomes essentially impossible to plead one of these claims, then you've invalidated the primary holding of duty offer. You've said that, actually, no. An ESOP fiduciary has virtual immunity to claims of prudence because you can never plead the claim against them because there's always some fiduciary action, some fiduciary you can imagine, taking issue with the proposed alternative action. And if you interpret it that broadly, if you make it that constrictive, then you are going not only against duty offer, but you're going against the plain language of the statute, which doesn't carve out any kind of special pleading exception for claims involving ESOPs. All right. Mr. Bondrock, let me ask Judge Betus or Judge Nygaard if they've got further questions for you. No, not for you. So I'm going to ask some of the same things to opposing counsel, but I'm fine with Mr. Bondrock. I have no questions, Judge Jordan. Okay. Thanks, Mr. Bondrock. We'll have you back on rebuttal. Mr. Haraka, the floor is yours. Thank you very much, Judge Jordan. May it please the court, counsel, this is Joseph Haraka, Becker LLC, on behalf of the defendants' appellees. Judge, a lot of discussion took place during the course of Mr. Bondrock's oral argument and the questions that were posed to him by the district panel regarding what has transpired since the time of the 2013-2016 class period. And I think we're going well beyond the four corners of the consolidated complaint. And I think that at this point there's been an appeal by a decision of the district court dismissing, on the basis of the 12B6 motion, what was before her within the four corners of that complaint. Mr. Haraka, Judge Betus, in your brief you asserted that nothing ever came of the price-fixing allegations against generic manufacturers. Would you withdraw that assertion now? To a certain extent, yes. It's still unclear, and there hasn't been any criminal charges, Judge Betus. Did I get that right? Is this Judge Betus? It's Judge Betus, yes. Yeah, I apologize. It's hard to keep your voices. Quite all right. Thank you for your understanding. You know, obviously the briefing that took place in this case took place back in the 2018 timeframe. But I really think it's irrelevant, with all due respect, Your Honor. Isn't it relevant to whether we asked to give leave to amend, that the facts that they might add now look different from the facts that this was a 2017 complaint? That's exactly where I was going. To the extent that at the time that the briefing took place before the district court judge, the plaintiff's appellant had not provided any indication, any facts whatsoever, as to how they would address any defects that were found within the four corners of the complaint by Judge Woodington. And that's why I was going to argue and would say to this panel that under the circumstances, the district court clearly did not abuse its discretion, because even though Federal Rule 15.8.2 provides a great deal of flexibility and indicates that a court should freely allow where justice requires the amendment of a pleading, at the time, there was no indication by the plaintiff's appellant as to any additional facts by which they were led or any new legal theories that they would add to their complaint that they had four opportunities to do so. Judge Bevis, let's talk about that four. There's a California complaint. Then it's amended voluntarily by plaintiffs. There's no motion to dismiss or anything that forces them to. There's a New Jersey complaint. Then they're consolidated in an NMDL. Once they're consolidated, why are we treating this as a fourth complaint rather than functionally a first one that's never been challenged as insufficient? If we had 90 complaints come together in an NMDL, would you say that's the 91st? They get no opportunity to amend in the NMDL because there have been 90 that preceded it? It seems functionally like it's a first one. At least the first time you get challenged for insufficiency, we freely give leave to amend. Well, Your Honor, that's true. That's not true with all due respect. It's really not the first time that they tried to put together plausible allegations that the defendants, in this case the fiduciaries, had violated their fiduciary duties of prudence, loyalty, and failure to monitor. Hold on, Mr. Horakka. This is Judge Jordan. Assume for the sake of discussion all that were true, that this really was the fourth go-round for them. Through the fault of nobody, to the extent you want to attribute delay to anybody, your side is the one that said, hey, hold this case until Jander comes out, so got held. Now we are two years down the pipe. There are things that could be said. Is it right and fair to ignore the current state of affairs and say, yeah, we're just not paying attention to that because nobody knew that two years ago? Or should we in fact be paying attention to what has come out in related litigation and say, no, there ought to be leave to amend because there's information there that they didn't submit it to the judge in the Judge Jordan, there was a joint request on the part of both parties to place things on hold with respect to Jander. That wasn't just a means of methods by which the accountants were trying to delay a decision of some sort. But the bottom line is, as you well know, Your Honor, the duty of prudence and whether or not there's been a violation of that with respect to an ESOP plan fiduciary is determined and evaluated at the time of the circumstances of the question of conduct. It's not from the vantage point of hindsight. So we really have to go back to the 2013-16 class period. Okay, so Mr. Noretka, be faithful for a second. It's not we're not talking about hindsight. We're talking, as I understand it, we're talking about things which have emerged in related litigation about things that were contemporaneous. That is, what the ESOP, at least one ESOP fiduciary knew at that time. Why would it be improper for them to be able to amend to take account of that in their allegation? Because even with that knowledge and with their addressing what I feel to be within the four corners of the complaint at this point, a failure on their part to even clear the first hurdle, and the first hurdle is we don't even look at any of the alternative actions that they're proposing, but the first hurdle is that they plausibly allege that at the time the defendants knew or should have known that the market price of the company stock was based on material faultless legal statements, such as to make it an imprudent investment. It's Judge Bevis here, Mr. Haricot. Let's go back to the relevant time, 2013-2016. Fair enough. Let's look at what is related in Judge Hayden's complaint, which is applying the heightened flawed pleading standard. There's an allegation in the complaint that executives from Allergan were talking privately with other drug companies, including Heritage Pharmaceuticals, whose former president and CEO both pled guilty to antitrust violations, concerning their agreement to the prices of additional generic drugs. Now, it may be that that is outside of the four corners of this complaint, and maybe this complaint is insufficient. Maybe this complaint failed to state a claim. Okay? We can talk about that. But let's say it does. Let's also assume Judge Jordan is right that we don't close our eyes in deciding whether it be futile to grant leave to amendment. We can look at what we know now about futility. Is there any argument that it is futile to give leave to amend when there are private, nonpublic, conspiracy statements that another court found met a higher pleading standard? Why would it be futile to amend and add those? I'll address that, Your Honor. Thank you for crystallizing it and making it so clear what you're seeking from me. Even if that were the case, okay, and Mr. Butteroff and Plankus have an opportunity or you provide them with an opportunity for leave to amend to reallege various facts that have developed since the time of the class period. The focus needs to be whether or not a reasonable prudent fiduciary sitting in the situation of the planned fiduciary at the time, back in 2003 to 2016, could not have concluded, as this judge stated, that the disclosure of negative information would do more harm than good by causing a reduction in the stock price and a concomitant reduction in the value of the fund. All right. Now you're getting to the heart of the issue. And as Judge Jordan says, the Second Circuit said, you know, there are two ways that in two different places in the opinion, Fifth Third states the standard at least slightly differently. Towards the end, it uses could not have. But that's a little strange for a couple reasons. First of all, when it actually articulates what it says it's holding is on 2472, it says would not have. And then it's at the end of the opinion it says could not have. Secondly, Fifth Third was an opinion that discarded a too defendant-friendly standard because it would be impossible to meet. And it seems odd, then, that it would erect another standard that would be impossible to meet if any fiduciary would. So is this standard under 12-year negligence? Have you plausibly pled that a prudent fiduciary would not have done this? That's a hypothetical one. Not that no fiduciary would have, but plausible to have no fiduciary would have done this. I would submit no, Your Honor. And the reason why is even though they cast aside the favorable presumption that had been adopted by various lower courts and indicated that the only distinction between an ESOP fiduciary and an ERISA fiduciary is the fact that the ESOP fiduciary isn't obligated to diversify the plan holdings. Nonetheless, they basically placed a very high bar for these types of stop, drop, or ERISA breach of fiduciary claims to go forward because the whole purpose of it, as they stated, was to address that rock-and-a-hard-place dilemma that is presented to a fiduciary, a planned fiduciary, and to weed out the meritless goats from the plausible sheep. That's the hard part, Mr. Packer. Please don't think that any of the questions we're giving you or Mr. Bonner, I'll tell you that we're on your side, we're on the other side. We're trying to figure this out. I respect that, Your Honor. I'm not taking offense. I just believe that the Supreme Court clearly set a high bar recognizing that it didn't want to encourage or shield the planned fiduciary from economically burdensome lawsuits. Hold on a second. Hold on. The fact that they talk about sheep versus goats means there's got to be some sheep out there, right? Yes. And there's examples. Federal courts have provided examples whereby, be it a Ponzi scheme I set forth in the Southern District of New York in the Price case or in the Southern District of Texas in the BP litigation, they talked about a situation where, unlike a highly capitalized plan, there could be a relatively new company with a very new plan that's not highly capitalized, where some of these issues of being in a rock and a hard place and the new challenges talked about by Injun aren't as readily present. Okay. What about – hold on just a second. Give me one quick follow-up here. So assume for the sake of discussion that your opponent was prepared to come forward and add allegations to a complaint of the sort described in the In Re Allegance, generic drug pricing security litigation opinion that Judge Hayden handed down in August of last year. Non-public, private conversation, contemporaneous. Other conspiracy. That's the assertion. That's the pleading. Is it your position that if those things were in a complaint, that that would still be something that could not survive a motion to dismiss because anything they did, including disclosure, would negatively affect the stock price? In certain ways, yes. And please hear me out. Allow me an opportunity to clarify. What I'm suggesting is, as recognized by many of your sister circuit courts and federal district court judges throughout the country, okay, an earlier disclosure is not always beneficial. It doesn't allow for a full and complete investigation. It doesn't allow for the pairing of that disclosure with some sort of remedial action. It doesn't allow for a disclosure to be made in normal channels. So even if those allegations are added to the complaint in this instance, and even if they have to be accepted as true, a reasonable, prudent producer, in the same situation as the alleged producer found themselves in back during the class period, even assuming that this court would need to accept those additional allegations as true, could have still determined that there would be more harm than benefit to the plan because of the reduction in stock price and how it would harm the stock price for the funds that were already in the plan itself, and that that harm would basically offset any benefit of its early disclosure. I get your argument. You've focused very clearly, Judge Divas. Your argument now turns on that a fiduciary could have determined this. I think your words were earlier disclosure is not always beneficial. So if the plating standard is, as you say, that no prudent fiduciary could have done this, that the majority of searches have accepted, that's a good argument. But if the plating standard is, as Chandra says, or as the Supreme Court seems to say at 2472, then that's not a good argument. So that's going to turn on which rule we ultimately adopt here. The other – I don't mean to cut you off, Your Honor, and I'm so sorry. Without being able to speak body language, it's hard to see whether or not you're trailing off or you're saying it's not happening. Your Honor, to me it's a wonder why the Second Circuit really raised this issue of whether it's a would-of or could-of situation, whether we're talking about a reasonable fiduciary or any fiduciary. And I just really think they – I mean, Mr. Bondrock seems to even believe it's a distinction without a difference. The Amgen Court, which came out shortly after the Fifth Circuit decision, seems to suggest that it's a could-not-have-concluded distinction. And so – It's a bracket. If it's a distinction without a difference, it shouldn't matter whether it's could-or-would, right? I mean, the fact that you're hitting the could pretty hard seems to indicate you think there is a distinction there. There is a difference there. Is there or isn't there? Because if there isn't, you shouldn't care. Well, the reason I'm addressing it, Your Honor, is that to me if it's could-have-concluded, then I go back to what I'm suggesting, and that is that even under a revised consolidated complaint, that adds in any factual – additional factual allegations that could be made by Mr. Bondrock here on behalf of the plaintiffs really doesn't impact the fact that the plant fiduciary back in 2013 and 2016 could have said to themselves, hey, let's not make an early disclosure because we have to wait to see how things play out. Let's do – Can that really be the rule, though? Can it really be interpreted that way? Because just take Mr. Bondrock's argument head on here. His assertion is if you read it that way, you're ignoring – you're focusing on one sentence in an opinion and ignoring the import of the entire opinion. The entire opinion is trying to say to you, hey, you courts of appeals, you've set the bar too high. And if we read it the way you're reading it, it not only doesn't accomplish what the Supreme Court was trying to do, it actually sets the bar higher yet makes it impossible to meet. That I take it is the plaintiff's argument. What's your best response? My best response, Your Honor, is that even though various courts have indicated that the standard is very tough, highly exacting, and currently difficult to satisfy, it doesn't make breach of fiduciary duty cases based on non-public information extinct. And, again, I've offered up two examples that were discussed in both the Price case, you know, with respect to a Ponzi situation, and in the BP litigation case, in which the plan is relatively new and not highly capitalized. And so that there, if there's a price drop by virtue of an earlier disclosure, that there's definitely more benefit to be had by the post-disclosure purchasers, and that those benefits are not offset by the harm caused to sellers and the harm caused to the funds. All right. Mr. Haraka, Judge Bevis, let's imagine we accept your most – to the extent there's a difference, we accept the stricter version of the phrasing, could not have determined. But if you read tip third, it's very clear that the prudent fiduciary follows the securities laws, right? So the prudent fiduciary is not allowed to trade insider information. But by the same token, the prudent fiduciary is required to make disclosures required by the securities laws. And I thought one of the strongest points in Mr. Bondar's presentation was some of the allegations appear to be that the securities laws require these fiduciaries to disclose more. Not earlier optional disclosures you've been talking about, but they had to disclose what they knew under some of the securities rules. And indeed, the solicitor general, the government's brief in Jander, took a pretty narrow view of tip third, but did take the position that a fiduciary has to disclose the stuff that's already required by the securities laws. And if not, they're liable not only under the securities laws, but they're also liable to the plan participants. What do you say about that argument that isn't it actionable? Do you have a legal problem with saying it would be actionable to tip third, or is yours just a factual problem that you don't think that's present in this case? Well, both, Your Honor, both. And you hit the nail on the head. I mean, I don't think it's present in this case, at this point at least. I don't think there's been any indication of criminal activity on the part of the allegate or the plan fiduciaries. But even so, the plan fiduciaries have to wear two hats. And there actually was a disclosure of the Department of Justice subpoena that was served on it within the bounds of an SEC filing. So it really depends on whether or not and at what point in time and whether or not during the class period they had an obligation to make a disclosure earlier than the actual disclosures ultimately came out. But if they did have an obligation to make a disclosure and they made it substantially later than they would have been required under the law, is there any reason they wouldn't be actionable under Fifth Third? In that specific instance, no, Your Honor. No. Okay. So you're saying that was not the case here. You're not saying there's a problem under Fifth Third. That should be actionable. That's correct, Your Honor. I apologize if I didn't make myself clear on that. Okay. And answer, if you would, also Mr. Fondros' assertion that if we accept the position you're taking, Mr. Hiraka, that you'd end up with a circumstance where a greater obligation is owed to the general public under the securities laws than is owed under a fiduciary obligation to the ESOP plan participants. Well, Your Honor, that gets a little more complicated and complex than just stating it as simply as Mr. Vondroff may have made. I mean, you know that under ERISA it takes a functional approach, and you know that generally speaking these plan fiduciaries also wear two hats. And so it really is an open issue as to what obligations they have when they serve as the plan fiduciaries and exercise authority, control, or discretion over the plan and its benefits and what they therefore owe under ERISA to those plan beneficiaries and what additional corporate financial information that they may learn in their corporate capacity, which needs to be disclosed pursuant to securities laws to protect the general investing public. Generally speaking, I'm not saying that they're exclusively different. There's clearly an overlap at times, but there's also a debarkation between the responsibility of ERISA fiduciaries and responsibility of those same fiduciaries in their corporate capacity. And I know there is an overlap. But, Mr. Hiraka, I'm trying to get you to speak specifically to his point that the world would seem upside down if you, at the end of the day, said, hey, there are facts out there that show and demonstrate the higher standard of liability under the securities laws. But those same facts, assuming they were pled, would not satisfy the fiduciary standard under ERISA. I'm not doing justice, perhaps, to Mr. Bondaroff's placing of the argument, but that's what I'm trying to get you to address. Is it an upside down world if we come out and say, yeah, this is no good, and at the same time there's a securities class action going on or purported class action where a motion to dismiss has been denied because the court has said, you know what? You've pled enough to meet that higher standard. No, Your Honor, and I'm not suggesting that Mr. Bondaroff would be wrong in all instances. What I'm suggesting, and I'm sorry if I haven't made myself clear, what I'm suggesting is that even under the circumstance where that is the case, I do believe that under Fifth 30 Amgen, a planned fiduciary could weigh and evaluate the cost benefits associated with the various alternative actions that are available to them and the timing associated with the disclosures, the form the disclosures take, and whether or not those disclosures should wait until a full and complete investigation is done and whether they could be paired with a remedial action. Because the bottom line, Your Honor, is in an efficient market, which Mr. Bondaroff talks about in his papers, that stock is evaluated based on all publicly available information. But the two most important factors, Your Honor, are the stock's perceived risk profile and its future expected earnings or business prospects. And I believe it's incumbent upon a planned fiduciary not to unnecessarily or preliminarily raise and heighten that risk profile such that there is a precipitous drop in the stock that would hurt the planned participants who already own stock in the fund. Mr. Herrera, we got you. Judge Phoebus has a follow-up question about that. So I want to hear you say a little bit about, we've talked primarily about the first remedy they seek and how a disclosure, you could see that legally required disclosures might be required, but they're concerned about other disclosures. Well, how about their second and third remedies? The second one about freezing, apparently Mr. Bondaroff concedes he'd have to make an SEC filing if they kept selling the top line, but he takes the position that they could freeze buying and selling, not make an SEC filing, but seems to concede that that would still send a signal to the market. And I don't know if you agree that no SEC filing would be required. If you want to say something that would be, maybe that would send more of a signal. But I'd like to hear what is required in that circumstance. And in the third remedy, which is the cash buffer, Mr. Bondaroff says that neither an SEC filing nor it may be that any other disclosure is required on a cash buffer. Forgive me if I misstated that. Are disclosures to the SEC or to the public required for either or both of those remedies? I believe they are, Your Honor, and I believe that those alternative actions are actually less viable than a corrective disclosure for many reasons. And I believe that various federal courts agree with that. What authority is there for the requirement to be an SEC filing for either or both of those? What should we look at? Your Honor, to me, actually freeze purchases based on inside information that's inconsistent with how the market is pricing the stock because of the presence of material false or misleading statements in the actual public marketplace, I believe is something that implicates not only the necessary disclosures under the plan documents because there's an obligation on the fiduciary to invest primarily in company stock. And I take issue with Mr. Bondaroff's position that even in a cash buffer situation, even if there should be a unitized bond as opposed to the actual owning of company stock, that that could be done without disclosures to plan fiduciary. But I would believe that in some ways it's akin and it smacks up insider trading. And clearly other federal circuit courts and federal district courts have indicated that the mere prospect of the fact that security laws could be implicated could actually weigh in the analysis under Fifth Third and Amgen as to the harm versus good discussion. All right. So you haven't cited something to me, but you're implying that there's a Rule 10b-5 problem with freezing, buying, and selling. Your Honor, it's really unclear, and I think it's the totality of the circumstances as to whether or not there is a 10b-5 argument. But I think that you have to give the benefit of doubt when a plan fiduciary is weighing a cost-benefit analysis as to whether to engage in an alternative action as to whether or not that could possibly implicate a remedy violation or at least provide ammunition to a plaintiff's bar to bring such a violation against them. Let's worry about the second remedy. Let's talk about the third one, the cash buffer. Mr. Bondaroff's law dictates a more firm position on the cash buffer. And he says, look, the plan documents say only that they must primarily invest in the company's stock, not exclusively. Plans are allowed to carry a cash buffer. The authority that was cited in the district court, there was specific authority that the district court relied on, the 207-I or whatever it was, for the second, for the freeze. But the district court really had no citations, one sentence or two of assertion on the cash buffer. And if cash buffers are allowed and if there's not a 10b-5 problem because you're not trading based on it, then why do you think that's going to move the market? Because Mr. Bondaroff conceded that maybe the freeze would send a signal to the market, but he did not concede that the cash buffer would send a signal, and cash buffers are normal. So what's harmful? What's so obviously harmful about that? It invokes the rock-and-a-hard-place position that a fiduciary finds himself in that was specifically referenced in Fifth Third. And that is to the extent that a fiduciary believes that because of material false information, that the market price of the stock in the company is distorted and therefore imprudent, he basically faces a dilemma, and that is to the extent he or she decides to continue to invest, he faces the claims that are the subject of this action if the stock price ultimately goes down. But to the extent that he stops investing and takes that money instead and bolsters up the cash buffer, first he faces the investment drag issue. He also then faces the prospect of being subject to possible liability of not following the planned documents, of investing primarily in the company's stock. So in fact, exclusively for a significant period of time in cash, he's acting inconsistent with those planned documents, and he can actually be sued. So he's damned if he does, and he's damned if he doesn't. It's a dirty work and a hard place. Let's talk about this case. Isn't the amount that was already – I'm guessing the amount that was already invested in Allegan's stock far exceeded the inflows during these couple of years? Am I wrong? I mean, did not this ESOP substantially predate 2013, in which case there would have been a lot more contributions in there and there's no danger of it being exclusively cash or even primarily cash? That's a correct observation, and I respect that, Judge Jordan. But nonetheless, it doesn't eliminate the investment drag concern on the part of the fiduciary, whereby – Mr. Bogdanoff's argument had some force to it, which is investment drag is only an issue if the value is otherwise going to go up. But if you're in a position where a reasonable fiduciary with this knowledge knows it's going to go down, then dragging it zero is the better outcome than losing money. I mean, the drag only works if the stock is otherwise going up. And that's correct, but again, you have to put yourself in the shoes of a planned fiduciary looking at this from a cost-benefit analysis. Even though Mr. Bogdanoff is touting and overstating, in my personal opinion, the benefits associated with a cash buffer, there's clearly downsides that a planned fiduciary is allowed to take into consideration, Judge, in making an ultimate determination as to the harm versus good analysis. Okay. Okay. Judge Bevis, anything further for me? Nothing further. Okay. Judge Nygaard, anything for Mr. Haraka? No, I'm fine, thanks. Okay. Thanks, Mr. Haraka. Appreciate your argument. Mr. Bogdanoff, you've got your time for rebuttal. Thank you, Your Honor. Just making sure, can everyone still hear me okay? Yes. Oh, good. Okay. I muted myself during the other side. All right. So I think that this has really come down through the questioning today to two issues that I just want to focus on. One is the underlying factual allegations sufficiency, and the other is the correct more harm than good standard to apply. As far as the sufficiency of the allegations go, given what has happened since this claim was briefly argued, it would be, we think, fair to give us a lead to amend if, in fact, this court finds that. What would be the basis for that now, Mr. Bogdanoff? We're going to be looking at this particular decision, that is the decision not to allow you to amend for an abuse of discretion. Is that right? That's correct. Okay. On an abuse of discretion standard, given what was before her at the time, how could we say there was an abuse of discretion when you really didn't tell her what you were going to say that was going to be any different than what you'd already said? That's true. And based on the facts that we have, there wasn't, you know, we didn't at the time have the available facts that would have changed the court's view on the sufficiency of the underlying misconduct allegations. We do have that information now. Yeah, so that's my question, and it's not a gotcha question. It's just a serious, what's the legal basis? If we assume for the sake of discussion, we thought, yeah, there ought to be an opportunity to amend. What would be the legal basis on which we would say that? How would we manage the standard of review and what was done in the district court and give you what you want? In light of the youth accidents that have come to light, it would be highly prejudicial to the employees in this case to leave them without a remedy because they had the unfortunate circumstance of filing and briefing at the wrong time, whereas the consumer plaintiffs, the government plaintiffs, and the security plaintiffs, because they happened to be briefing their arguments later through nothing other than random circumstance, were able to plead those facts. You essentially leave the employees without a remedy purely on a technical procedural ground when there is discretion within that standard. There is discretion that this court has to make an allowance for the sake of equity. As far as the second issue goes, the could versus would language, I believe it was Judge Bevis, and I apologize if I'm misidentifying your voice. I believe it was Judge Bevis who crystallized that issue. You can actually in this case put aside the could versus would standard because I think as the solicitor general's brief shows, if you apply the standard of they're going to have to make a disclosure under the securities laws as a matter of law, then whether it's a could versus would standard, a prudent fiduciary is going to look at her parallel securities disclosure obligation, realize that bill is coming due, and she can't avoid disclosure. It's going to happen. So are you suggesting that we have to make a decision on an unbriefed complex question of securities law in order to decide whether or not you've made out enough of an ESOP claim to dismiss? Well, no. One of the reasons I think both sides asked this court to wait on this argument until Gander was decided was to see what happened in that court, in that case, and how that decision and to a lesser extent the briefing in that decision might impact this court's decision. So this court is certainly free to take notice of the arguments made in that before the Supreme Court and what the Supreme Court has had to say about it since then. Or for that matter, what the Second Circuit says now on briefing. You're missing my point. I take your argument now to be, look, they were going to have to say something, because if they didn't, they were going to be in violation of the securities law. That's an assertion of law based on facts which are not pled in the complaint that's before us. So you're asking us and telling us in order to rule for you, what we would need to do is we would need to decide a securities law question. That is, was it required? Were they going to in fact have to make a disclosure? And we're going to need to make that decision when there's been no briefing on that issue before us. And we're going to need to make it on the basis of facts that aren't before us, because they're not in your complaint. Have I followed that line of reasoning right? Well, I think that in fact the facts that are in our complaint are sufficient under the Iqbal-Tuamvi standard. You know, it is true that there are these additional facts in the securities case, but the securities law is also supposed to have a higher factual bleeding standard of plausibility than just Iqbal-Tuamvi. So we actually believe, and I think if you go back and look at the facts that are in our complaint, it does satisfy the Iqbal-Tuamvi standard, which is all this court is supposed to consider. We're not supposed to have to plead scienter or any of that kind of specificity in order to plead a plausible claim. That said, even if you don't – I don't want to get us too far afield here, but your complaint as it currently stands is Bernie Sanders and a colleague in the House said, hey, there's an 8,000% rise in your price on an antibiotic. That's highly troubling. And a national advocacy group for pharmacists says effectively the same thing. And on that basis, you say we've met Tuamvi and Iqbal. Clearly there was an antitrust conspiracy here. That's the position you're giving us? Parallel pricing rise is sufficient to infer the existence of a price fixing conspiracy. And particularly then in light of the government investigations that were launched and the subpoena that was served, those allegations are increased in plausibility. Well, they're just subpoenas. Sorry? They're just subpoenas. I mean, they're subpoenas, they're investigations. Is that really enough to go on? Well, in and of itself, no one of these facts is enough to go on. They have to be taken in aggregate. And it's important to remember, especially for ELISA participants, it's very hard to plead more specific facts than that at this stage. Employees, unlike a lot of other plaintiffs, don't have access to most of this information. They have very little they can go on. This is, you know, the Eighth Circuit's point in the Brady v. Walmart case. And so, you know, we don't want to be in a situation where we parse each individual factual allegation individually and say that by itself it's not enough instead of looking at them in aggregate. The only other point I would make is – well, actually, two very short points and then I'll conclude. One is that, you know, the question was put to Mr. Haraka about what would be a plausible claim to plead for a case like this. And he referred to the Price case with – you know, the idea that the only time you could plead a prudence claim based on ESOP is where there's a Ponzi scheme of the ESOP, meaning that the underlying ESOP is essentially worthless and that it would be impossible to – you know, that by the time you sued, you've already lost all your money. It doesn't seem like that's the carve-out the Supreme Court was looking for in Dudenhofer. I don't think there's anything in the Dudenhofer opinion that suggests they want to raise the standard to the point where if it's not a newly capitalized plan or a Ponzi scheme, no claim can ever be pleaded. The government has not taken that position in its amicus brief and neither has any other court. You know, the other appellate decisions that have ruled on Dudenhofer cases did not involve cases where a parallel security class action passed the motion to dismiss. Jandor didn't. Martone, the whole proof case in the Fifth Circuit didn't. Graham v. Fearon, the Sixth Circuit case didn't involve that. So, you know, there's something to be said for the fact that when you have both of those cases being plausible enough to be pleaded, it really should have more force. You should ask yourself, would defendants' pleading standard mean that a plausible claim could be pleaded against Enron? Because I think the standard they've articulated, it could not. And that should concern us because that means that these fiduciaries really do have a kind of a view. And with that, let's see if there are further questions. No, I think. Well, let me ask Judge Beavis or Judge Naggard, anything further? Nothing further. I don't know. Okay. All right, counsel, we thank you very much for a well-argued case, very interesting case. We got the matter under advisement. We'll be back to you and we'll recess court.